.UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| CREATION GARDENS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:26-cv-778-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| PAMELA ASHMORE, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |

*** *** *** ***

This matter is before the Court on a request for a temporary restraining order by Plaintiff Creation Gardens, Inc.[1] [R. 4]. Defendant Carmela Foods Distributing, Inc. ("Carmela Foods") and Defendant Pamela Ashmore filed responses, [R. 18], [R. 19], and Plaintiff replied. [R. 21]. This matter is therefore ripe for review. For the reasons set forth herein, the Court will grant the request for a temporary restraining order.

## I. BACKGROUND

Plaintiff is a food distributor that sells products to restaurants, hotels, universities, coffee shops, and other food service businesses. [R. 1, ¶ 16]. It is headquartered in Louisville, Kentucky, but operates across twelve states across the midwest and southeast, as well as Colorado. *Id.* It alleges it is "an industry leader in its region, including the Cincinnati and Northern Kentucky markets." *Id.*

Plaintiff hired Defendant Ashmore as a "customer advocate" on January 12, 2026, to work in these markets, specifically in Cincinnati and Northern Kentucky. *Id.* ¶ 33. At the

[1] In its briefing, Plaintiff refers to itself as "Creation Gardens, Inc. d/b/a What Chefs Want," or "WCW." *See, e.g.*, [R. 4-1, p. 1]. However, the caption of the complaint identifies Plaintiff as only Creation Gardens, Inc. *See* [R. 1, p. 1].

commencement of her employment, Plaintiff alleges that Ashmore signed a Non-Competition Agreement (hereafter, the "Agreement") which contained various restrictive covenants, including non-competition, non-solicitation, and non-disclosure provisions. *Id.* ¶¶ 41–48; *see also* [R. 1-1 (Agreement)]. Ashmore resigned from her position with Plaintiff on July 21, 2026. *Id.* ¶ 49.

On September 28, 2026, Plaintiff filed this lawsuit against Ashmore and Carmela Foods, alleging that, immediately following or shortly after her resignation, Ashmore began working for Carmela Foods "as a sales representative marketing competing products to the same customers to whom she was selling [Plaintiff's] products," in violation of the Agreement's various restrictive covenants. *Id.*¶ 50. Plaintiff raises the following claims: a "Claim for Injunctive Relief," against both defendants, and a claim for tortious interference with contractual relations against only Defendant Carmela Foods. *Id.* ¶¶ 59–77. Plaintiff seeks "[p]reliminary and permanent injunctive relief prohibiting Defendants from violating or interfering with the Agreement; and preventing Defendants from profiting or benefiting from their wrongful conduct"; an "[o]rder that Defendants return any and all of [Plaintiff's] confidential information, and an order prohibiting any further use or benefit from the use of such information"; and "judgment in [Plaintiff's] favor and against Carmela for all damages that may be calculated that [Plaintiff] may recover as a result of Defendant's misconduct." *Id.* at 15 (Prayer for Relief).

Also on September 28, 2026, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction, [R. 4]. The Court conducted a telephonic status conference regarding this motion on October 2, 2026, at which counsel for Plaintiff and Defendant Carmela Foods appeared. [R. 11]. Defendant Ashmore also appeared, stating that she had retained counsel, but they were unable to attend the call. *See generally id.* During the call, counsel and the parties indicated a willingness to meet and confer about a possible agreement that would resolve the

request for a temporary restraining order. However, by subsequent status report, the parties indicated that they were unable to reach such an agreement. [R. 14]. The Court thereafter conducted an additional telephonic status conference, at which counsel for each party appeared, and set a scheduling order on the request for a temporary restraining order. [R. 17]. Those briefs have now been filed. *See* [R. 18], [R. 19], [R. 21]. Having reviewed the briefing, the Court finds that no evidentiary hearing or further argument is necessary at this time. *See generally* by *Farnsworth v. Nationstar Morg., LLC*, 569 F. App'x 421, 427 (6th Cir. 2014) (explaining that a motion for preliminary injunction may be denied without a hearing, even when a hearing is requested). The matter is therefore ripe for review.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the issuance of temporary restraining orders. *See* Fed. R. Civ. P. 65. The Sixth Circuit has described a temporary restraining order as "an extraordinary remedy designed for the limited purpose of preserving the status quo pending further proceedings on the merits." *Stein v. Thomas*, 672 F. App'x 565, 572 (6th Cir. 2016).

In determining whether to grant such relief,

> the Court considers the same four factors applicable to a motion for preliminary injunction: (1) the movant's likelihood of success on the merits; (2) whether the movant "would likely be permanently harmed absent the injunction; (3) whether the injunction would cause substantial harm to third parties; and (4) whether the injunction would serve the public interest."[2]

*Dinter v. Miremami*, 627 F. Supp. 3d 726, 730 (E.D. Ky. 2022) (quoting *McGirr v. Rehme*, 891 F.3d 603, 610 (6th Cir. 2018)). However, while the standard for a temporary restraining order is

[2] Federal Rule of Civil Procedure 65 imposes additional requirements when the temporary restraining order is issued without notice to the adverse party. *See* Fed. R. Civ. P. 65(b). However, in the present case, there is no dispute that each defendant has received notice of Plaintiffs' request for a temporary restraining order, as those defendants have appeared (by counsel), participated in a telephonic status conference, and both defendants have filed a response to Plaintiffs' motion.

the same as that for a preliminary injunction, "there is an increased emphasis on irreparable harm." *Id.* (citations omitted); *see also Ecolab, Inc. v. Shanklin*, No. 3:23-CV-215-CHB, 2023 WL 4365933, at *2 (W.D. Ky May 12, 2023) ("Importantly, while this inquiry requires the Court to balance multiple factors, 'the existence of an irreparable injury is mandatory.'" (quoting *Ohio v. Becerra*, No. 21-4235, 2022 WL 413680, at *2 (6th Cir. Feb. 8, 2022))).

Importantly, "[a] party seeking a temporary restraining order bears the burden of making a 'clear showing'" that he or she is entitled to such relief. *Rayford v. Wells Fargo Bank, N.A.*, No. 5:25-CV-348-KKC, 2026 WL 1262970, at *3 (E.D. Ky. May 1, 2026) (citing *Winter v. NRDC*, 555 U.S. 7, 22 (2008)). Indeed, given that temporary restraining orders (and preliminary injunctions) are "extraordinary and drastic remed[ies]," they are "never awarded as of right," and instead, "[t]he standards governing both remedies are necessarily high." *N.R. by and through Ratliff v. Pike Cnty. School Dist. Bd. of Educ.*, No. 21-78-HRW, 2022 WL 837724, at *2 (E.D. Ky. Mar. 21, 2022) (quoting *Munaf v. Geren*, 553 U.S. 674, 690–91 (2008)) (internal quotation marks omitted). Ultimately, the decision to grant or deny a temporary restraining order is within the discretion of the district court. *Dinter*, 627 F. Supp. 3d at 730 (citation omitted).

## III. ANALYSIS

A noted, a Court considers four factors when addressing a motion for temporary restraining order: the moving party's likelihood of success on the merits; whether the moving party will suffer irreparable harm in the absence of the temporary restraining order; whether third parties will suffer substantial harm as a result of the temporary restraining order; and whether such relief would serve the public interest. *See Dinter*, 627 F. Supp. 3d at 730. The defendants in this case argue that each factor weighs against issuing the requested temporary restraining order. The Court therefore considers each factor in turn.

**A. Likelihood of Success on the Merits**

To demonstrate a "likelihood of success on the merits," a movant must simply show that it has a "reasonable probability that it will prevail on the merits." *Dinter*, 627 F. Supp. 3d at 730 (quoting *Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 589 (W.D. Pa. 2009)). In its motion, Plaintiff argues that it is likely to succeed on both its "Claim for Injunctive Relief" against both defendants, which the Court construes as a breach of contract claim,[3] and its claim for tortious interference with contractual relations, which it asserts against only Defendant Carmela Foods. [R. 4, pp. 11–13]; *see also* [R. 21, pp. 2–10]. However, in its reply brief, Plaintiff makes clear that it "is not seeking a temporary restraining order, nor a preliminary injunction based upon" the tortious interference claim. [R. 21, p. 10]. As such, for purposes of the pending motion, the Court considers only the likelihood of success on the breach of contract claim.

"To prevail on a breach of contract claim in Kentucky, a plaintiff must demonstrate by a preponderance of the evidence that (1) a contract existed, (2) the contract was breached, and (3) plaintiff suffered loss/damages flowing from the breach." *Babcock Power, Inc. v. Kapsalis*, No. 3:13-CV-717-CRS, 2019 WL 1518166, at *2 (W.D. Ky. Apr. 8, 2019), aff'd, 854 F. App'x 1 (6th Cir. 2021). In the present case, Plaintiff alleges that the Agreement is a valid and enforceable contract; Ashmore breached the Agreement by working for Carmela Foods, a direct competitor of Plaintiff and by "actively attempting to solicit customers from [Plaintiff] to Carmela [Foods]"; and Plaintiff has suffered and will continue to suffer harm as a result. [R. 4-1, pp. 11–13]. From this, the Court understands that, for purposes of the pending motion, Plaintiff relies specifically on the alleged breaches of the non-competition and non-solicitation provisions of the Agreement.

---

[3] Plaintiff also refers to this as a breach of contract claim. *See, e.g.*, [R. 4, p. 11].

Defendants, for their part, do not appear to dispute that, if the Agreement is valid and enforceable, Ashmore's conduct (i.e., working for Carmela Foods and soliciting Plaintiff's customers) would be in violation of those provisions and Plaintiff may have suffered damages as a result. *See generally* [R. 18]; [R. 19]. Instead, Defendant Ashmore argues that (1) Plaintiff cannot prove that she executed the contract; and (2) regardless, the provisions at issue, which reference her "termination," do not apply where she voluntarily resigned. [R. 19, pp. 4–10]. In addition, both defendants argue that the restrictive covenants at issue in this case are unreasonable and therefore unenforceable. *Id.* at 10–14; [R. 18, pp. 4–7].

**1. Ashmore's Execution of the Agreement**

Ashmore first argues that Plaintiff has not established "that Ashmore executed and assented to the particular Non-Competition Agreement [Plaintiff] now seeks to enforce." [R. 19, p. 4]. In making this argument, Ashmore acknowledges that, under Kentucky's Uniform Electronic Transactions Act, an electronic signature "may not be denied legal effect or enforceability solely because it is in electronic form." *See* Kentucky Revised Statute ("KRS") § 369.107(1); [R. 19, p. 5]. However, she argues, such an electronic signature can only be attributed to the named signatory if "it was the act of the person." *See* KRS § 369.109(1). And here, Ashmore "disputes that she signed or authorized the purported covenant." [R. 19, p. 5]. In support, Ashmore provides a declaration in which she states that, when she completed the employee onboarding process with Plaintiff, "[n]o one explained that [she] was being asked to sign a noncompete agreement," and she "did not sign, electronically sign, authorize, or otherwise asset to the completed Non-Competition and Non-Solicitation Agreement that [Plaintiff] seeks to enforce in this action." [R. 19-1, ¶¶ 3–4 (Ashmore Declaration)].

In response, Plaintiff agrees that, under Kentucky law, "[a]n electronic record or electronic signature is attributable to a person if it was the act of the person." [R. 21, p. 4 (quoting KRS § 369.109(1))]. However, Plaintiff points out, the remainder of that statutory provision explains, "The act of the person may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable." *Id.* (quoting KRS § 369.109(1)). "Security procedure" is defined as

> a procedure employed for the purpose of verifying that an electronic signature, record, or performance is that of a specific person or for detecting changes or errors in the information in an electronic record. The term includes a procedure that requires the use of algorithms or other codes, identifying words or numbers, encryption, or callback or other acknowledgment procedures.

KRS § 369.102(14).

In this case, Plaintiff includes information about the company's online portal system through which Ashmore was instructed to sign the Agreement. *Id.*; *see also* [R. 21-1 (Godbey Declaration)]. As explained by Plaintiff, through the sworn declaration of its Chief Financial Officer, Ashmore was required to sign the Agreement as part of her employee onboarding process. [R. 21-1, ¶ 4]. During that process, new hires log into the company's online portal system ("Payroll System") using the employee's unique credentials, at which point the employee is presented with the Agreement. *Id.* ¶ 5. "When the employee completes the electronic signature, the Payroll System marks the task 'Completed' and places the employee's electronic signature and the date on the" Agreement. *Id.* The declaration includes a screen shot from the company's Human Resource Information System showing that the task "Non-Compete Agreement" was completed by Pamela Rockenfield Ashmore on January 12, 2026. *Id.*; *see also* [R. 21, p. 4]. The declaration further explains that this notation "would only appear if the employee, in this instance Ms. Ashmore, had completed the electronic signature." [R. 21-1, ¶ 7]. Plaintiff argues that these types

of security procedures are "exactly the showing that [Kentucky's Uniform Electronic Transactions Act, and specifically KRS § 369.109(1)] contemplates." [R. 21, p. 5].

Plaintiff also explains that a copy of the signed form was stored on Ashmore's Payroll System profile under "My HR/Forms/My All Forms," and she could view and download the signed form from that location. [R. 21-1, ¶ 8]. However, a generic, unsigned copy of the Agreement is also available under an "Other Forms" tab. *Id.* ¶ 9. The company's IT records indicate that Ashmore accessed that unsigned version three days prior to resigning, rather than accessing the signed version. *Id.* ¶¶ 8–9; *see also* [R. 21-2 (Zucker Declaration). From this, Plaintiff argues, it is clear that Ashmore was aware of the Agreement's existence, despite her assertion that no one ever told her about it. [R. 21, p. 3].

Based upon this record, and for purposes of the pending motion, the Court finds that Plaintiff is likely to demonstrate that Ashmore executed the Agreement. The record demonstrates that employees like Ashmore signed the Agreement after logging into the Payroll System using their own unique credentials, and there is no evidence (or argument) that those credentials consisted of only readily-discoverable generic information. *Cf. Bazemore v. Papa John's U.S.A., Inc.*, 74 F.4th 795 (6th Cir. 2023) (finding genuine issue of material fact where employee disputed that he had signed an arbitration agreement and his login credentials "were clearly made up of demographic information" available from his application, such that his manager was able to log in for him and other employees); *Freidmann v. Jefferson Cnty. Bd. of Edu.*, 647 S.W.3d 181 (Ky. 2022) ("[A] person signing the electronic petition need only type a name and address, social security number or birth month, and the name and number of their voting precinct. In an electronic environment where generic information such as this is discoverable, such information, alone, is insufficient to establish attribution."). Moreover, Ashmore's employment with Plaintiff was

contingent on her assenting to the Agreement. *See* [R. 4-1, p. 2 ("Employee acknowledges that as a condition to [Plaintiff] hiring Employee, [Plaintiff] requires that Employee enter into this Agreement.")]. *See generally Ecolab*, 2023 WL 4365933, at *6 ("As counsel for Ecolab noted, his $9,588 incentive award was expressly conditioned upon his execution of the Agreement, and at no point did Defendants' counsel indicate Shanklin did not, in fact, receive that award."). Lastly, the fact that Ashmore later located and downloaded the form Agreement on the online portal cuts against her argument that she was never aware of the Agreement. *See generally id.* ("[T]hat Shanklin previously executed at least two similar employment agreements cuts against his convenient argument that he cannot recall executing the one at issue here.").

The case relied upon by Ashmore, *Bazemore v. Papa John's U.S.A., Inc.*, 74 F.4th 795 (6th Cir. 2023), does not alter the Court's analysis. In that case, the defendant-corporation moved to compel arbitration of the plaintiff-employee's Fair Labor Standards Act case. *Id.* at 797. For support, the company included a declaration explaining that employees sign the arbitration agreement by logging into an online program with their user credentials, scrolling through the entire agreement, then checking a box in order to sign. *Id.* The company's records indicated that the plaintiff had followed this process, but the plaintiff provided a sworn declaration in which he swore that he had never seen the agreement and "had never heard about it," his login credentials were made up of easily discoverable demographic information, and he had seen his manager log in using other employee's user credentials "to complete training materials" for the employees. *Id.* The Sixth Circuit found that the conflicting evidence created "a genuine issue of material fact," and because motions to compel arbitration are governed by the same standards applicable to motions for summary judgment, the district court was required to conduct a trial on the issue.[4] *Id.*

---

[4] On remand, the matter was resolved by settlement. *See Bazemore v. Papa John's USA, Inc.*, Civil Action No. 3:22-cv-00311-RGJ-CHL, R. 77 (Feb. 10, 2025).

at 798; *see also Boykin v. Family Dollar Stores of Michigan, LLC*, 3 F.4th 832, 836 (6th Cir. 2021).

This case is factually distinguishable from *Bazemore*, in that Ashmore does not allege that her user credentials were made up on easily discoverable demographic information, such that other employees could and did log in to her account. In addition, there is evidence in this case that Ashmore downloaded the unsigned version of the time prior to resigning, indicating her awareness of the Agreement. Moreover, unlike the Court in *Bazemore*, this Court does not apply the standard applicable to motions for summary judgment when considering a motion for a temporary restraining order and whether a plaintiff is likely to succeed on its underlying claims. Instead, to demonstrate a "likelihood of success on the merits," a movant must simply show that it has a "reasonable probability that it will prevail on the merits." *Dinter*, 627 F. Supp. 3d at 730 (quoting *Trefelner*, 655 F. Supp. 2d at 589).

Thus, for the reasons already explained, the Court finds that, on the current record, Plaintiff has demonstrated a reasonable probability that it will prevail on the merits of its breach of contract claim to the extent it must demonstrate that Ashmore assented to the Agreement.

**2. Termination Language**

Next, Ashmore argues that, even assuming she did assent to the Agreement, its non-competition and non-solicitation terms were triggered only in the event of a "termination," but she voluntarily resigned. [R. 19, pp. 7–10]. Specifically, she points to the Agreements non-competition provision, which provides, in relevant part, "Employee agrees that during Employee's employment with [Plaintiff] and for a one (1) year period following the termination of Employee's employment with [Plaintiff] for any reason whatsoever (the 'Term'), Employee shall not . . . ." [R. 4-3, p. 2 (the Agreement)].[5] The non-solicitation provision likewise references "a one (1) year period following

[5] To the extent the page number listed on a document conflicts with the page number assigned by the Court's electronic docketing system, the Court references the page number assigned by the docketing system.

the Term." *Id.* at 3. Plaintiff argues that the Agreement's use of the term "termination" refers to adverse employment actions, not voluntary resignations. [R. 19, pp. 7–8]. Thus, Ashmore argues, even if the Agreement is otherwise valid and enforceable, the relevant provisions do not apply here. *Id.*

The Court finds this argument wholly unpersuasive and illogical. A "fundamental principle[ ] of contract interpretation" is that "review must begin with an examination of the plain language of the instrument." *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). Here, the Agreement's restrictive covenants apply following "termination of Employee's employment with [Plaintiff] for any reason whatsoever." *See* [R. 4-3, p. 2]. The plain and ordinary meaning of the term "termination" is an "end in time or existence." Termination, Merriam-Webster, https://www.merriam-webster.com/dictionary/termination (last visited November 2, 2026). It can also refer to "the act of terminating," *id.*, with "terminate" defined as "to form an ending," or "to come to an end in time." Terminate, Merriam-Webster, https://www.merriam-webster.com/dictionary/terminating (last visited Nov. 2, 2026). Thus, the plain language of the Agreement demonstrates that its restrictive covenants are triggered upon the termination, or end, of the employee's employment, for any reason whatsoever. Indeed, other courts that have considered this exact issue have concluded that such unambiguous language, when read in the context of the whole agreement, "must be construed to include an employee's voluntary resignation." *Christiansen v. Multi-Color Corporation*, No. 1:22-cv-01086-TMH, 2024 WL 3487734, at *4 (D. Del. July 19, 2024).

Moreover, courts generally avoid interpreting a contract term in an unreasonable way that would lead to an absurd result. *See Samaan v. General Dynamics Land Systems, Inc.*, 835 F.3d 593, 601 (6th Cir. 2016). Here, the Agreement explains its purpose in clear terms:

> Employee will be employed by [Plaintiff] in a position of trust and confidence. This position of trust will expose Employee to certain proprietary information of [Plaintiff], including without limitation, information concerning [Plaintiff's] customers, supplies, marketing plans and programs, all of which [Plaintiff] has developed by investment of considerable time, effort and expense.

[R. 4-3, p. 2]. As part of the Agreement, Ashmore "acknowledges and understands that this information of [Plaintiff] constitutes a valuable part of [Plaintiff's] assets and goodwill," and "further acknowledges that this Agreement is necessary for [Plaintiff] to protect its confidential information, property rights, and goodwill." *Id.* It would be an absurd interpretation to hold that Plaintiff only needed to protect its confidential information, property rights, and goodwill in the event an employee was involuntarily terminated, but not if an employee voluntarily resigned.

Lastly, Ashmore's reliance on various cases in which courts have distinguished between "resignation" and "termination" is misplaced. For instance, Ashmore cites to *Mullen v. Houston-Johnson, Inc.*, No. 2017-CA-001648-MR, 2019 WL 1224622 (Ky. Ct. App. Mar. 15, 2019) and argues that this case "makes it clear that the specification of the method of the end of employment is an essential part of contract interpretation, and parties cannot over broaden the language they choose." [R. 19, p. 8]. But *Mullen* does no such thing. In that case, the Court of Appeals of Kentucky simply held that the language "you separate" in an employment contract was not ambiguous, and the common-sense meaning of the phrase "encompasses the possibilities of both resignation and termination." *Mullen*, 2019 WL 1224622, at *6.

The case *Lantech.com, LLC v. Yarbrough*, No. 3:06-CV-334-JDM, 2006 WL 3323222 (W.D. Ky. Nov. 14, 2006) is equally inapplicable. In that case, the employer had terminated its employee "in a manner which was abrupt, peremptory, and without explanation," and "in contravention of its own employment policies." *Id.* at *2. The Court held that the company could not act in that manner and then "simultaneously obtain enforcement through equity of its

anticompetitive clause." *Id.* But here, as already explained and as Ashmore acknowledges, she voluntarily resigned. Yet, she conveniently overlooks an important discussion of the impact of such resignations in the *Lantech.com* case. As the Court explained, "The policy behind enforcing noncompetition clauses is to protect businesses against employees resigning and taking valued clients with them." *Id.* (quoting *Managed Health Care Assoc., v. Kethan,* 209 F.3d 923, 929 (6th Cir. 2000)) (internal quotation marks omitted). The Court further explained that, in other similar noncompete cases, "had the defendant voluntarily severed her employment with the plaintiff, the court would not have hesitated to enforce the non-competition agreement." *Id.* (discussing *Orion Broadcasting, Inc. v. Forsythe*, 477 F. Supp. 198 (W.D. Ky. 1979)). As such, the *Lantech.com* supports Plaintiff's position more than Ashmore's.

Accordingly, for purposes of the pending motion, the Court finds that it is likely that Plaintiff can demonstrate that the Agreement's provisions are applicable in this case, where Plaintiff voluntarily resigned.

**3. Reasonableness of the Non-Competition and Non-Solicitation Provisions**

Both defendants argue that, even assuming Ashmore assented to the Agreement, the restrictive covenants at issue are not reasonable and are therefore not enforceable. [R. 18, pp. 4–7]; [R. 19, pp. 10–14]. Kentucky courts "look to the reasonableness of a noncompetition agreement to determine whether the agreement is enforceable." *AWP, Inc. v. Safe Zone Servs., LLC*, No. 3:19-CV-00734-CRS, 2022 WL 989133, at *7 (W.D. Ky. Mar. 31, 2022) (citing *Advanced Sols., Inc. v. Chamberlin*, No. 07-612-C, 2007 WL 4215654, at *5, 2007 U.S. Dist. LEXIS 87887 (W.D. Ky. Nov. 27, 2007)). Kentucky courts have further explained that

> an agreement in restraint of trade is reasonable if, on consideration of the subject, nature of the business, situation of the parties and circumstances of the particular case, the restriction is such only as to afford fair protection to the interests of the

> covenantee and is not so large as to interfere with the public interests or impose undue hardship on the party restricted.

*Hammons v. Big Sandy Claims Serv., Inc.*, 567 S.W.2d 313, 315 (Ky. Ct. App. 1978). Stated another way, "[t]he assessment of 'reasonableness' . . . takes into consideration the interests of the employer, the hardship on the employee, and the interests of the public." *AWP, Inc.*, 2022 WL 989133, at *7 (citing *Hammons*, 567 S.W.2d at 315). In balancing these interests, "courts consider: (a) the 'nature of the business or profession and employment,' including the character of the service that is performed by the particular employee; (b) the duration of the restriction; and (c) the scope and/or territorial extent of the restriction." *ISCO Industries, Inc. v. Shugart*, No. 3:14–CV–00249–TBR, 2014 WL 2218116, at *3 (W.D. Ky. May 28, 2014)). These factors are "very broad, allowing a good deal of discretion to the district court in making its analysis." *Lantech.com*, 247 F. App'x at 774 (quoting *Vencor, Inc. v. Webb,* 33 F.3d 840, 845 (7th Cir. 1994)) (internal quotation marks omitted).

Kentucky law ultimately "favors the enforcement of reasonable noncompete clauses." *Material Handling Systems, Inc. v. Cabrera*, 572 F. Supp. 3d 375, 391 (W.D. Ky. 2021) (quoting *Edwards Moving & Rigging, Inc. v. Lack*, No. 2:14-cv-02100-JPM-tmp, 2014 WL 12531102, at *3 (W.D. Tenn. Mar. 5, 2014)) (internal quotation marks omitted). Indeed, "[t]he policy of this state is to enforce [noncompetition clauses] unless very serious inequities would result." *Id.* (quoting *Lareau v. O'Nan*, 355 S.W.2d 679, 681 (Ky. 1962)) (internal quotation marks omitted).

With these principles in mind, the Court turns to the specific provisions at issue in this case. As noted above, the relevant provisions for purposes of the pending motion are the non-competition and non-solicitation provisions. *See* [R. 4-1, pp. 11–13]. Those provisions state, in full:

> **<u>Non-Competition.</u>** Employee agrees that during Employee's employment with

[Plaintiff] and for a one (1) year period following the termination of Employee's employment with [Plaintiff] for any reason whatsoever (the "Term"), Employee shall not, within a one hundred (100) mile radius of the [Plaintiff] location the Employee primarily works out of, directly or indirectly, whether as a sole proprietor, shareholder, director, officer, member, manager, employee, agent, partner, joint venturer, trustee, consultant, contractor, or otherwise of any entity, irrespective of whether compensation is provided, own, operate, manage, control, engage in, conduct, finance, be connected with or employed by, have any interest in, participate in any manner in, act as a consultant for or advisor to, aid or assist in any manner, or render any services for (alone or in association with any person or entity) any business venture or enterprise that directly or indirectly engages in, or proposes to engage in, any business activity which is similar to or competitive with [Plaintiff].

**Non-Solicitation.** Employee agrees that during Employee's employment with [Plaintiff] and for a one (1) year period following the Term, Employee shall not, directly or indirectly, whether as a sole proprietor, or as a shareholder, director, officer, member, manager, employee, agent, partner, joint venturer, trustee, consultant, contractor, or otherwise, of any entity, take the following actions, irrespective of whether compensation is provided, engage in any of the following activities:

> employ, induce, solicit for employment, or assist others in employing, inducing or soliciting for employment any individual or entity which is an employee, consultant or independent contractor of [Plaintiff] or which was an employee, consultant, or independent contractor of [Plaintiff] in the preceding five (5) years;
>
> solicit, sell products or provide services which are the same type of products or services offered or provided by [Plaintiff] to any individual or entity which is a customer or customer of [Plaintiff] or which was a customer or customer of [Plaintiff] in the preceding five (5) years;
>
> sell products which are the same or competitive with the products offered by [Plaintiff] to any party which wholesales or resells [Plaintiff's] products, including, without limitation, any internet-based sales platform;
>
> contact, divert, take away, solicit, purchase, or accept business from any of [Plaintiff's] suppliers or vendors; or
>
> induce, solicit or encourage any individual or entity which is or was a customer, supplier, or contractor of [Plaintiff], or has another business relation with [Plaintiff], to cease or reduce its business with [Plaintiff] or in any way to interfere with the relationship between such individual or entity and [Plaintiff].

[R. 4-1, pp. 2–3].

As an initial matter, the Court notes that, on its face, the Agreement's duration and geographic scope appear reasonable. Indeed, Kentucky Courts routinely enforce non-competition and non-solicitation provisions of similar duration and geographic scope. *See Comfort Systems USA (Kentucky), Inc. v. AHM Bowling Green* LLC, No. 1:26-CV-0094-GNS, 2026 WL 2364301, at *9 (W.D. Ky. Aug. 14, 2026); *Ecolab*, 2023 WL 4365933, at *6; *Fruit of the Loom, Inc. v. Zumwalt*, No. 1:15CV-131-JHM, 2015 WL 7779524, at *4 (W.D. Ky. Dec. 2, 2015) (citing *ISCO Industries, Inc. v. Shugart*, No. 3:14–CV–00249–TBR, 2014 WL 2218116, at *3 (W.D. Ky. May 28, 2014)). Moreover, Carmela Foods does not challenge the reasonableness of the non-competition and non-solicitation provisions based specifically on duration or geographic scope. *See* [R. 18, pp. 4–7]. Ashmore, for her part, does not argue that the provisions are unreasonable based on their duration, and she only briefly references the geographic scope of these provisions when arguing that they are unreasonable.[6] *See* [R. 19, pp. 10, 13].

Instead, the defendants' primary argument appears to be that the restrictive covenants in this case are overly broad in that they "reach far beyond misuse of information or solicitation of identified accounts" and, as such, they suppress ordinary competition rather than protecting the plaintiff's business interests. [R. 18, pp. 5–7]; [R. 19, pp. 10–14]. For instance, Ashmore argues that the restrictive covenants are "not limited to particular customers, particular products, confidential information, or a particular sales role," and it instead "bars employment in a broad category of competing work regardless of whether the work involves any [of Plaintiff's] customer[s], any [of Plaintiff's] information, or any alleged misconduct." [R. 19, p. 11].

In making this argument, Ashmore relies primarily on *AWP, Inc. v. Safe Zone Servs., LLC*,

---

[6] To the extent she argues that the geographic scope is unrelated to Plaintiff's interests and/or suppresses ordinary competition, the Court addresses that issue below.

No. 3:19-CV-00734-CRS, 2022 WL 989133 (W.D. Ky. Mar. 31, 2022). In that case, the plaintiff was a traffic safety company that contracted with a utilities company to control and direct traffic around jobsites. *Id.* at *1. Plaintiff required its employees, including the workers providing traffic control services on the jobsites, to sign a confidentiality, non-competition, and non-solicitation agreement. *Id.* However, at some point, a competitor traffic control company began providing services to these same job sites and recruiting the plaintiff's employees. *Id.* at *3. Several former employees began working for the competitor. *Id.* The plaintiff sued the various former employees for, among other things, breach of contract, and eventually moved for summary judgment on that claim. *Id.* at *4.

In resolving that motion, the district court considered the reasonableness of those noncompetition agreements. In doing so, the Court noted that the case was unique in that it involved "low-skilled, at-will employees with no established customer base and no access to proprietary information, such as, for example, profit data." *Id.* at *7. Instead, the majority of cases applying Kentucky law (and relevant to that case, Ohio law) addressed the enforceability of noncompete agreements against "skilled workers, salespersons, [or] employees in management or other positions with access to sensitive materials." *Id.* From the outset, then, *AWP, Inc.* is distinguishable from the current case, which involves a sales type position (a "customer advocate") that requires extensive training and relies heavily on the employee's relationship with customers, and which exposed the employee to sensitive data. *See, e.g.*, [R. 1, ¶¶ 3, 36–40]; [R. 4-2 (McGaha Declaration)].

In *AWP, Inc.*, the district court relied heavily on the fact that the employees were unskilled, at-will employees without a customer base or access to confidential information when it considered the company's purported legitimate business interests. *AWP, Inc.*, 2022 WL 989133, at *8–11. In

doing so, the Court emphasized that "[t]he policy behind enforcing noncompetition clauses is to protect businesses against employees resigning and taking valued clients with them." *Id.* at *8 (quoting *Managed Health Care Assocs. v. Kethan*, 209 F.3d 923, 929 (6th Cir. 2000)) (internal quotation marks omitted). But unlike "employees who established or planned to establish competing enterprises, had sales positions, or had positions that heavily relied on the development of strong personal relationships with customers," the employees in *AWP, Inc.* "did not have a 'book of business' or client list that they could bring with them from their former employer," they were not responsible for bringing in new clients or business, and they did not have access to "customer and sales information." *Id.* At most, the employees' limited interactions with customers required no more than any other employee would be expected to provide: "to treat customers with respect and to deliver quality customer service." *Id.* at *9. "This does not give rise to a protectable interest." *Id.* Moreover, to the extent that the plaintiff had demonstrated that it invested *some* time and money into training the former employees, the Court questioned "whether this investment is 'significant' enough to constitute a 'legitimate business interest.'" *Id.* at *11.

By contrast, the current record demonstrates that Ashmore's position as a customer advocate required extensive personal training. [R. 4-2, ¶¶ 14–15]. Indeed, Ashmore had no prior sales experience. *Id.* ¶ 10. Through her training, Ashmore was introduced to Plaintiff's customers in the Cincinnati and Northern Kentucky areas, many of whom she did not know prior to her employment with Plaintiff. *Id.* ¶ 16. She also had access to the customers' price levels, "data regarding pricing and unique customer information," and "customer relationship management information." *Id.* ¶¶ 18–19. Given Ashmore's sales position, her reliance on customer relationships, and her access to sensitive customer information, the Court has little trouble concluding that Plaintiff has a legitimate business interest in restricting this former employee's

ability to compete in the same market and solicit customers. This is particularly true where, as here, the record reflects that Plaintiff is an "industry leader in its region, including the Cincinnati and Northern Kentucky market," and its "competitive advantage" comes at least in part from "the customer relationships developed by its sales staff," which resulted from "years of developing personal relationships with the customers." *Id.* ¶¶ 3–4.

Regarding Ashmore's interests and public policy, the Court acknowledges that Ashmore will be prohibited from working in the food distribution industry, for the duration of and within the geographic scope of the non-competition provision. But "[l]imiting future employment options is precisely the point of a noncompete agreement, which Kentucky Law and Kentucky courts regularly enforce when tailored in scope and duration." *Material Handling Systems*, 572 F. Supp. 3d at 392. And Ashmore, who has previous experience working in the restaurant industry unrelated to her work with Plaintiff, has not offered any allegations or evidence that she cannot find work outside of the restricted market. *Id.* "Nor has [she] pointed to any law indicating that such an inability, if true, would bar enforcement of a noncompete agreement." *Id.* In this way, this case is again distinguishable from *AWP, Inc.*, where the Court found it difficult "to envision how [the plaintiff's] asserted interest could be protected without imposing undue hardship on a group of low-wage earners." *AWP, Inc.*, 2022 WL 989133, at *11.

The Court also notes that *AWP, Inc.* is distinguishable from the current case because that decision involved motions for summary judgment. As the Court has already explained, for purposes of the pending motion, it asks only whether Plaintiff has shown that it has a "reasonable probability that it will prevail on the merits." *Dinter*, 627 F. Supp. 3d at 730. Under this less demanding standard, and on the record before it, the Court finds that Plaintiff's legitimate business

interests, when weighed against Ashmore's interests and the public's, renders the non-competition and non-solicitation provisions reasonable and enforceable.

As noted above, the defendants do not appear to dispute that, if these provisions are valid and enforceable against Ashmore, her actions (i.e., working for Carmela Foods and soliciting Plaintiff's customers) breach those provisions. The record likewise supports Plaintiff's position that Ashmore has breached the non-competition and non-solicitation provisions in this manner. *See, e.g.*, [R. 4-2 McGaha Declaration]. The Court therefore finds that, based on the current record and for purposes of the pending motion, Plaintiff is likely to prevail on its breach of contract claim, with respect to the Agreement's non-competition and non-solicitation provisions.

**4. The Non-Disclosure Provisions**

The Court again notes that, in its motion seeking a temporary restraining order, the plaintiff argues that it is likely to succeed on its breach of contract claim with respect to the non-competition and non-solicitation provisions. [R. 4-1, p. 12]. Nevertheless, the defendants briefly address the non-disclosure provision in their responses. [R. 18, p. 7]; [R. 19, p. 11]. Neither defendants argue that this specific provision is unenforceable, [R. 18, p. 7]; [R. 19, p. 11], and the Court has, on the current record, already disposed of the defendants' other arguments relating to the validity and enforceability of the Agreement. As such, the Court expects that the defendants will fully comply with the terms of the non-disclosure provision of the Agreement.

**B. Irreparable Harm**

Having determined that Plaintiff is likely to succeed on at least one of its claims, the Court next turns to irreparable harm. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated by money damages." *Owensboro Specialty Polymers, Inc. v. Daramic, LLC*, No. 4:20-CV-163-JHM, 2020 WL 13577473, at *1

(W.D. Ky. Sept. 25, 2020). A harm is typically not irreparable if it is fully compensable by money damages. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992); *see also SEIU Health Care Michigan v. Snyder*, 875 F. Supp. 2d 710, 723 (E.D. Mich. 2012) ("Monetary damages, however substantial, do not constitute irreparable harm." (citation omitted)). "However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer*, 973 F.2d at 511 (citation omitted).

Moreover, to obtain a temporary restraining order, the harm alleged "must be 'so immediate' that relief is necessary before a preliminary injunction hearing can occur." *Touzi Tech LLC v. BioFuel Mining, Inc.*, No. 3:22-cv-00002-GFVT, 2022 WL 127970, at *1 (E.D. Ky. Jan. 13, 2022) (citing *Branch Banking and Trust Co. v. Jones*, 5:18-cv-610-JMH, 2018 WL 10772684, at *2 (E.D. Ky. Nov. 19, 2018)) (internal quotation marks omitted). And the moving party must show that, in the absence of injunctive relief, "they will suffer 'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (citations omitted); *see also Bradley v. Detroit Bd. of Ed.*, 577 F.2d 1032, 1035 (6th Cir. 1978) (explaining that injunctive relief should not be based on speculation and "unfounded fears").

As to this factor, Defendants argue in part that Plaintiff cannot satisfy the irreparable harm factor because the harm alleged can be remedied through monetary damages. [R. 18, p. 10]; [R. 19, p. 15]. However, the law is clear that "competitive injury and loss of customer goodwill" constitute irreparable harm. *Basicomputer*, 973 F.2d at 511 (citation omitted). Indeed, as the Sixth Circuit has explained, "the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Id.* at 512 (citation omitted). Likewise, "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from

such losses are difficult to compute." *Id.* (citation omitted); *see also FirstEnergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013) ("If Flerick succeeds in luring FirstEnergy's potential customer base to Reliant, FirstEnergy may never be able to recover that lost business, thereby suffering irreparable harm."); *Certified Restoration Dry Cleaning Network, L.L.C., v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) ("The likely interference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages are difficult to calculate.").

Here, as already explained, Plaintiff has demonstrated that it is likely to succeed on its claim that Ashmore has violated the terms of the Agreement and specifically, the non-compete and non-solicitation clauses. From these alleged breaches, Plaintiff is likely to suffer loss of fair competition and loss of customer goodwill and relationships. Indeed, on the current record, the evidence indicates that Ashmore has contacted Plaintiff's customers while working for Carmela Foods in the geographic region covered by her non-compete, and has solicited business from those customers. *See generally* [R. 4-2]. And several of the customer accounts that Ashmore managed while employed by Plaintiff "have stopped or significantly reduced their orders with" Plaintiff. *Id.* at ¶ 37. On this record, and for purposes of this temporary restraining order, the plaintiff has sufficiently demonstrated the types of losses (i.e., loss of fair competition and loss of customer goodwill) that satisfies the irreparable harm requirement. This irreparable harm is not speculative or hypothetical; it is actual and ongoing. Accordingly, the Court finds that this second factor weighs heavily in favor of issuing a temporary restraining order.

**C. Balance of Harms**

"The third factor for a court to consider is 'whether the issuance of the injunction would cause substantial harm to others.'" *Dinter*, 627 F. Supp. 3d at 733 (citation omitted). "While this

factor is generally concerned with harm to third parties, courts also often consider the 'balance of hardships' between the parties if an injunction were to issue." *Id.* (citations omitted).

With respect to this factor, the parties focus on the "balance of hardships," *id.*, between them, with the defendants first arguing that the harm to Plaintiff is minimal. [R. 18, p. 11]; [R. 19, p. 16]. For instance, Carmela Foods argues that, in the absence of an injunction, Plaintiff "remains free to pursue damages and permanent relief after discovery." [R. 18, p. 11]. This argument, of course, rests on Carmela Food's position that Plaintiff cannot satisfy the irreparable harm requirement because any harm can be remedied with monetary damages. The Court has already disposed of this argument. *See supra* Section III(B). As already explained, the potential harm to Plaintiff is significant and irreparable.

Ashmore, for her part, argues that the harm to Plaintiff is minimal because the interests it seeks to protect (i.e., "alleged confidential information and customer relationships") "can be preserved through narrower measures, including a preservation order, a prohibition on use of specifically identified confidential information, and, if eventually supported by evidence, account-specific restrictions." [R. 19, p. 16]. It is unclear what Ashmore means by "preservation order" or a "prohibition" on the use of certain information. To the extent Ashmore argues that narrowly tailored injunctive relief can protect Plaintiff's interests, the Court agrees and, for all the reasons stated herein, will be granting a narrowly tailored temporary restraining order.

Having established that the harm to Plaintiff in the absence of an injunction is both significant and irreparable, the Court considers the potential harm that injunctive relief might cause to the defendants or third parties. On this point, Defendant Carmela Foods argues that "Ashmore would be rendered unable to work in her chose field in any capacity anywhere within commuting distance of her home," and a temporary restraining order "would also impair Carmela [Food's]

ability to compete in the market and interfere with its lawful business operations." [R. 18, p. 11]. Defendant Ashmore similarly argues that she will "face[] the immediate loss of her livelihood and ability to work in her established field." [R. 19, p. 16].

In light of the specific relief requested in this case, i.e., the enforcement of the narrowly tailored restrictive covenants as outlined in the plaintiff's proposed order, [R. 4-6], the Court finds these characterizations of the potential harm to Defendants to be overstated. *See Ecolab*, 2023 WL 4365933, at *8 (acknowledging the defendant's "strong objection to the extent [the plaintiff] seeks for [the individual defendant's] employment with [the competing entity] to be terminated entirely," but explaining that the plaintiff did not seek such relief and instead "[the plaintiff] seeks to enforce the specific, narrowly tailored non-compete, non-disclosure, and non-solicitation covenants in the [a]greement" at issue in that case). Regardless, even assuming Defendants might suffer some degree of harm from the issuance of the injunction, the plaintiff has demonstrated a likelihood of success on at least some of its claims and a likelihood of irreparable harm, and any such harm to Defendants would be self-inflicted. *See H.H. Franchising Systems, Inc. v. CareSmart Solutions, Inc.*, No. 1:21-cv-575, 2022 WL 4274278, at *6 (S.D. Ohio Sept. 15, 2022) ("When the harm to a defendant is self-inflicted, it is outweighed by the irreparable harm to the party seeking injunctive relief." (citation omitted)); *Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 33 (6th Cir. 2011) (discounting harm to the defendant when it "knowingly and illegally placed itself in the position to be placed out of business"); *Ecolab*, 2023 WL 4365933, at *9 (similar); *Hickman v. Turitto*, No. 1:06-CV-151, 2007 WL 1080090, at *3 (E.D. Tenn. Apr. 9, 2007) (finding that the defendants were likely to suffer little, if any harm, where they were enjoined "from doing something he already should not be doing"). Moreover, the Court is not aware of any potential harm to third parties.

The Court therefore finds that the harm to Plaintiff (in the absence of a temporary restraining order) outweighs the potential harm to Defendants if such an order is issued. This third factor therefore weighs in favor of issuing a temporary restraining order.

**D. Public Interest**

Finally, the Court must analyze whether the public interest favors granting a temporary restraining order. As to this factor, the defendants appear to acknowledge that the enforcement of reasonable and enforceable restrictive covenants serves the public interest. [R. 18, p. 11]; [R. 19, p. 16]. To the extent the defendants rely on their earlier arguments that the covenants at issue are *un*reasonable or *un*enforceable, and therefore the enforcement of such provisions does not serve the public interest, the Court has already explained that Plaintiff is likely to demonstrate that the covenants at issue were reasonable and enforceable under the law. *See supra* Section III(A). And the law is clear that the public interest is served by enforcing such contracts. *See Certified Restoration Dry Cleaning*, 511 F.3d at 551 ("Enforcement of contractual duties is in the public interest."); *Zumwalt*, 2015 WL 7779524, at *5 (same); *Ecolab*, 2023 WL 4365933, at *8 (collecting cases).

On this point, the defendants argue that any "general interest the public may have in seeing that noncompetition clauses are enforced is countervailed by the public's interest in allowing workers like Defendant Ashmore to continue performing their trade." [R. 18, p. 11]; *see also* [R. 19, p. 16 ("The public has an interest in enforcing reasonable restrictive covenants, but it also has an interest in allowing workers to continue performing their trade when the asserted restraint is disputed or broader than necessary.")]. This argument appears to stem from *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964 (6th Cir. 2002), a case cited by both Defendants. There, the district court denied a request for a preliminary injunction in a case involving similar claims of breaching

a non-competition agreement. *Id.* at 965–67. More specifically, the court "found that the plaintiff had failed to show a strong likelihood of success on the merits of both its non-compete and trade secrets claims, had failed to show a threat of irreparable injury, and had failed to show damage to the public interest." *Id.* at 967. On appeal, the Sixth Circuit briefly addressed the district court's analysis on the public interest factor, noting that it was "entirely appropriate" for the district court to "underweight" that factor. *Id.* at 970. The Sixth Circuit explained, "while the public generally may have an interest in seeing that reasonable non-compete covenants are enforced, the court determined in this instance that the public interest would best be served by allowing a successful salesman to continue performing his trade." *Id.* But importantly, the plaintiff in that case "ha[d] not challenged that determination on appeal," and moreover, the district court had found that the plaintiff was *not* likely to succeed on his claims and could *not* show irreparable harm. *Id.*; *see also id.* at 967; *see also Apex Tool Group, LLC v. Wessles*, 119 F. Supp. 3d 599, 610 (E.D. Mich. 2015) (finding that the public interest factor did "not weigh in favor of either party" for similar reasons, after first finding that the plaintiff was unlikely to succeed on the merits and could not demonstrate irreparable harm).

By contrast, the Court in this case has already concluded that Plaintiff is likely to succeed on its underlying breach of contract claim and can demonstrate irreparable harm. That is, at the very least, Plaintiff can likely demonstrate that Ashmore entered into the Agreement, the Agreement was valid, reasonable, and enforceable, and Ashmore is in breach of the Agreement, and her breaches will likely result in irreparable harm to Plaintiff. And as the Sixth Circuit has explained, "the public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts." *FirstEnergy*, 521 F. App'x at 529 (quoting *National Interstate Ins. Co. v. Perro*, 934 F. Supp. 883, 891 (N.D. Ohio 1996)) (internal quotation marks omitted).

Moreover, the defendants have not identified any potential harm to the public if a temporary restraining order is issued. *See, e.g.*, *Khiyani v. Allied Adult Day Care, LLC*, 4:25-CV-00114-GNS, 2025 WL 3527283, at *5 (W.D. Ky. Dec. 9, 2025) (discussing potential harm to certain members of the public if an injunction issued).

Thus, under the circumstances of this case and on the present record, the Court finds that this fourth factor weighs in favor of issuing a temporary restraining order. *See Ecolab*, 2023 WL 4365933, at *8; see also *Edwards Moving & Rigging*, 2014 WL 12531102, at *3 ("The Court finds that 'Kentucky public policy [ ] favors enforcement of noncompete agreements where an employee voluntarily gives up his employment.'" (quoting *Advanced Solutions, Inc. v. Chamberlin*, No. 07-612-C, 2007 WL 4215654 (W.D. Ky. Nov. 29, 2007)).

**E. Security Bond**

Under Rule 65, "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The decision to require bond is within the discretion of the district court. *See Ever-Seal, Inc. v. Halferty*, No. 3:22-cv-00082, 2022 WL 418692, at *10 (M.D. Tenn. Feb. 10, 2022) (citing *Moltan Co. v. EaglePicher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)).

In the present case, Plaintiff requests in its motion a security bond of $100.00; however, its proposed order lists a bond of $1,000.00. [R. 4-1, p. 14]; [R. 4-6, p. 3]. In their response briefs, the defendants argue that these suggested amounts are inadequate and do not account for Carmela Foods' lost business, Ashmore's lost income and benefits, and other potential losses that might occur in the event they are found to be wrongfully enjoined or restrained. [R. 18, pp. 12–13]; [R. 19, p. 17]. However, neither Ashmore nor Carmela Foods provides a proposed bond amount,

and they do not provide any evidence relating to the amount of potential lost business, Ashmore's income with Carmela Foods, income Ashmore might secure through different employment, or any other relevant information that would assist the Court in calculating an appropriate bond amount. [R. 18, pp. 12–13]; [R. 19, p. 17].

Plaintiff does not respond to these bond-related arguments in its reply brief. *See* [R. 21]. Thus, Plaintiff does not dispute that a security bond of $1,000.00 or less is insufficient. However, for the reasons stated above, the Court finds the record insufficient to allow the Court to determine a proper bond amount. The Court will therefore order the parties to meet and confer as to an appropriate amount. The Court will also order supplemental briefing on the issue of bond, in the event no agreement can be reached. *See Pure Romance Parties, Inc. v. Patterson*, No. 1:09cv293, 2009 WL 10679229, at *6 (S.D. Ohio July 10, 2009) (granting motion for temporary restraining order and preliminary injunction but ordering supplemental briefing on the issue of bond).

## IV. CONCLUSION

For the reasons set forth above, the Court finds that, on balance, the above-discussed factors weigh in favor of granting Plaintiff's request for a temporary restraining order. Accordingly, the Court being sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Plaintiff's request for a temporary restraining order, [**R. 4**], is **GRANTED**.
2. Defendant Ashmore, and her officers, agents, servants, employees, attorneys, and all persons acting in concert and participating with her, are, within a 100 mile radius of the Creation Gardens location Ashmore primarily worked out of, **TEMPORARILY ENJOINED** from directly or indirectly:
    a. rendering any services that directly or indirectly compete with Plaintiff;

b. inducing, soliciting for employment, or assisting others in employing, inducing or soliciting for employment any individual or entity which is an employee, consultant or independent contractor of Plaintiff in the preceding five (5) years;

c. soliciting, selling products or providing services which are the same type of products or services offered or provided by Plaintiff to any individual or entity which was a customer or customer of Plaintiff in the Cincinnati or Northern Kentucky markets;

d. contacting, diverting, taking away, soliciting, purchasing, or accepting business from any of Plaintiff's suppliers or vendors;

e. inducing, soliciting or encouraging any individual or entity which is or was a customer, supplier, or contractor of Plaintiff, or has another business relation with Plaintiff, to cease or reduce its business with Plaintiff or in any way to interfere with the relationship between such individual or entity and Plaintiff;

f. soliciting in any manner including social media tagging, email, text, mail, call, direct messaging, any current employee or client of Plaintiff; and

g. Ashmore is specifically restrained and enjoined from performing sales related work for Carmela Foods, including any marketing, sales calls, or affirmative action to bring clients into Carmela Foods within a 100 mile radius of the Creation Gardens location Ashmore primarily worked out of.

3. This temporary restraining order is effective as of the date and time of entry, **November 3, 2026 at the hour of 3:00 PM**, and will expire **on the earlier of a ruling by the Court on Plaintiffs' request for preliminary injunction, or fourteen (14) days from**

**its entry** in accordance with Federal Rule of Civil Procedure 65(b)(2) unless extended by subsequent order.

4. On or before **Tuesday, November 10, 2026**, the parties **SHALL** meet and confer and file a Joint Status Report regarding an appropriate bond amount, and any potential resolution of the pending request for a preliminary and/or permanent injunction.
5. If the parties are unable to reach an agreement that resolves the request for a preliminary and/or permanent injunction, the Joint Status Report referenced in the preceding paragraph **SHALL** (1) advise whether the parties seek limited discovery on Plaintiff's request for a preliminary injunction, and if so, provide a limited discovery plan; (2) provide a proposed briefing schedule on Plaintiff's request for a preliminary injunction; and (3) provide agreed upon potential dates for a preliminary injunction hearing. Upon receipt of the Joint Status Report, the Court will enter a discovery plan, enter a briefing schedule, and set a hearing to address the request for a preliminary injunction, if necessary.
6. If the parties are unable to reach an agreement regarding an appropriate bond amount, then within **seven (7) days** of the filing of the Joint Status Report, the parties **SHALL** file simultaneous briefs addressing this issue, not to exceed **five (5) pages** per brief.

This the 3rd day of November, 2026.

Claria Horn Boom

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY